```
                          UNITED STATES DISTRICT COURT
                          SOUTHERN DISTRICT OF FLORIDA

                          CASE NO. 10-21931-CIV-MARTINEZ
                          MAGISTRATE JUDGE P.A. WHITE

OWEN FINE,                    :

     Petitioner,              :

v.                            :      REPORT OF
                                     MAGISTRATE JUDGE
WALTER McNEIL,                :

     Respondent.              :
_____
```

## I.  Introduction

Owen Fine, who is presently confined at the Cross City Correctional Institution in Cross City, Florida, has filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. §2254, attacking his convictions and sentences in case number F83-13233B, entered in the Circuit Court of the Eleventh Judicial Circuit in Miami-Dade County.

This cause has been referred to the Undersigned for consideration and report pursuant to 28 U.S.C. § 636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2254 Cases in the United States District Courts.

The Court has before it materials including the petition (DE# 1), amended petition (DE# 11), Fine's response to the order to show case on limitation period (DE# 15), Respondent's response to an order to show cause with exhibits attached (DE# 16, 18), and Fine's reply to the response (DE# 22).

## II.  Factual and Procedural History

Fine was indicted for two counts of first degree murder, of Alphonso Sauceda and Francisco Damas, while attempting to commit trafficking of cocaine and/or robbery in violation of Fla. Stat. §§782.04, 775.087 (1983) (counts 1 and 2); two counts of attempted first degree murder, of Jose Garcia and Julio Barcelo, in violation of Fla. Stat. §782.04(1), 777.04, 775.087 (1983) (counts 3 and 4); armed robbery Fla. Stat. §§812.13, 775.087 (1983) (count 5); and trafficking in cocaine Fla. Stat. §893.03(2)(a) (1983) (count 6). (DE# 18, Ex. U, R 5-8).

At trial, Fine testified in his own behalf and provided the following facts. (DE# 18, Ex. U, T 411).  In May of 1983, Bob Weller moved into Fine's house.  (Id. at 416).  Fine received an income tax refund check and Weller explained a plan to use the funds to rip off some drug dealers. (Id.) Specifically, to cash the check and make stacks of money made up primarily of one-dollar bills, but with larger bills on the outside.  (Id. at 417).  They would then  claim the amount of cash to be much larger and purchase an amount of cocaine worth much more than the refund check. (Id.) Fine agreed to participate and, following Weller's directions, purchased two .45 caliber firearms. (Id. at 426).  In furtherance of the plan, Fine and Weller met with Alphonso Sauceda on June 11, 1983 and agreed to meet later that day at the house of a mutual friend, Frank Bones, to conduct the drug deal. (Id. at 421).  Fine and Weller next went to Bones's house and Bones agreed to leave for a few hours so they could use the house to meet with Sauceda. (Id.).  Weller and Fine then went to a gas station to wait for Sauceda, who eventually arrived driving a car with three passengers, Francisco Damas, Jose Garcia, and Julio Barcelo. (Id. at 424).  The entire group then went to Bones's house.  In the

2

front yard, Fine handed Damas a briefcase which contained the cash. (<u>Id.</u>).  Before entering the house and without being observed by the others, Fine hid a .45 in his back waistband and Weller hid the other .45 in his front waistband.  (<u>Id.</u> at 425, 429).  Once all six men were inside, Fine unlocked the briefcase and showed Damas the money.  (<u>Id.</u> at 429).  Damas flipped through one of the stacks and commented on the ones inside.  (<u>Id.</u> at 430). Damas explained that there did not appear to be enough cash.  (<u>Id.</u> at 433).  Damas then looked at Weller and asked about the bulge under his shirt, Weller pulled out his gun. (<u>Id.</u> at 434).  In light of Weller's actions, Fine pulled out his weapon. (<u>Id.</u> at 435).  Damas said there was no need for the guns and showed that he was not armed. (<u>Id.</u>).  Weller looked at Sauceda and said, "You know there is a hit out on you Al," and then shot and killed Sauceda. (<u>Id.</u> at 437).  Weller fired shots at the others and Fine aimed his gun at a spot on the couch and fired multiple times.  (<u>Id.</u>).  Fine admitted on cross-examination that one of his shots hit Jose Garcia.  (<u>Id.</u> at 487).  Fine eventually returned to the truck, Weller came out shortly thereafter and asked for more ammunition, which Fine provided. (<u>Id.</u> at 439). Damas was still alive and outside of the house.  (<u>Id.</u> at 442). Fine next heard more shooting and observed Weller trying to steal Damas's watch.  (<u>Id.</u>).  Fine said, "leave him alone, let's leave," and Weller got into the car and they left.  (<u>Id.</u> at 443).  Fine drove to his house where they packed up several things. (<u>Id.</u>).  Fine told Weller that they should meet at Coffey's General Store on the following Tuesday, June 14, 1983.  (<u>Id.</u> at 449).  Fine's girlfriend, Carla Hill, picked him up, at which point Weller put tupperware containers with cocaine in the backseat of Fine's girlfriend's car.  (<u>Id.</u>).  Fine and his girlfriend went to the Silver Sands Motel, and Fine brought Weller's containers into the room.  (<u>Id.</u>).  On Tuesday, Fine's girlfriend drove him to Coffey's. (<u>Id.</u> at 453).  When he entered the store, he was met not by Weller,

but by several detectives. (Id.). He was arrested and taken to
the police station. (Id.). At the close of the direct
examination, Fine testified that he waived his rights and
voluntarily gave a truthful statement to the police. (Id. at 453).


    The state presented evidence that Sauceda and Damas died as a
result of multiple gunshot wounds. (Id. at 65). Damas's body was
found in the front yard and Sauceda's body was found inside. (Id.
at 36, 47). A firearms examiner testified that each victim had
been shot by two different .45 caliber weapons. (Id. at 114-16).
Jose Garcia testified that he went with Damas to Bones's house on
the day in question. (Id. at 159). Garcia observed Fine shoot
Damas and Fine shot him. (Id. at 162). He struggled to a bedroom
and hid inside a closet. (Id.). After he heard Fine and Weller
drive away, he went outside and asked a neighbor to call the
police. (Id. at 167). He was hospitalized for his injuries. (Id.).
At the hospital, Detective Jose Diaz brought a photo line-up and
Garcia identified Fine as the man who shot him. (Id. at 172).

    Detective Diaz investigated after the bodies of Sauceda and
Damas were discovered at Bones's house on the night of July 11,
1983. (Id. at 198). Diaz learned from Bones that Weller and Fine
had obtained Bones's permission to use his house to meet with
Sauceda on July 11, 1983. (Id. at 200). Diaz tracked down Weller
who agreed to cooperate and told Diaz that he had plans to meet
Fine at Coffey's. (Id. at 205). Diaz went to Coffey's and arrested
Fine. (Id. at 208). At the police station, Diaz advised Fine of
his Miranda rights and had him execute a waiver of rights form, at
7:00 pm on June 14, 1983. (Id. at 209). At the outset of the
interview, Fine's comments were not recorded, accordingly, Diaz
testified to what Fine said. (Id. at 211-227). Diaz's testimony

regarding Fine's informal statement is consistent with Fine's testimony at trial.   Fine gave a formal statement from 11:28pm until 11:57pm, on June 14, 1983, which was transcribed and read for the jury. (Id. at 233-60).   The version of events in the formal statement is consistent with Diaz's testimony regarding Fine's informal statement and Fine's trial testimony.

Fine signed a consent to search form which authorized the officers to search his room at the Silver Sands Motel. (Id. at 209).   The officers found a bag with two tupperware containers which were full of white powder which tested positive for cocaine. (Id. at 313).

In the course of presenting its case, the state nolle prossed the charge for attempted first degree murder of Julio Barcelo (count IV).   (Id. at 348).   At the close of the state's case, defense counsel moved for a judgment of acquittal and asserted that the state failed to present independent proof in support of the robbery charge or the trafficking in cocaine charge. (Id. at 379). Defense counsel further argued that counts 1 and 2 for felony murder based on the underlying robbery and/or trafficking should also be dismissed. (Id. at 384).   The trial court granted the motion as to the robbery count and agreed that the robbery language should be stricken from the first degree murder charges in counts 1 and 2. (Id. at 396-97).

A jury found Fine guilty of counts 1, 2, 3, and 6. (DE# 18, Ex. U, R 168-71).   The trial court adjudicated Fine guilty and imposed a life sentence for counts 1 and 2 with a twenty-five year mandatory minimum for each count, a life sentence for count 3, and a thirty-year sentence for count 6, all sentences to run concurrently. (DE# 18, Ex. U, R 173-74).

On direct appeal, the public defender's office filed a motion to withdraw, with a supporting memorandum, pursuant to <u>Anders v. California</u>, 386 U.S. 738 (1967). (DE# 18, Ex. A, B). The Third DCA gave Fine an opportunity to file a <u>pro se</u> initial brief, however, Fine did not take advantage of the opportunity and filed no documents in the appellate proceedings. (DE# 18, Ex. C). Subsequently, the Third DCA <u>per curiam</u> affirmed the conviction and sentence without written opinion in <u>Fine v. State</u>, 498 So.2d 434 (Fla. 3d DCA Nov. 25, 1986). (DE# 18, Ex. D).

On December 15, 1988, Fine sought post conviction relief, filing in the trial court a <u>pro se</u> motion pursuant to <u>Fla.R.Crim.P</u>. 3.850. (DE# 18, Ex. E). Fine asserted ineffective assistance of counsel for failing to move to suppress his confession and the evidence found in his hotel room on the grounds that he was under the influence of cocaine when he gave his confession and signed the consent to search form. Fine claimed that he gave his lawyer the name of the intake officer, Robert Knapp, who processed Fine at the Dade County Jail shortly after he gave his confession and gave consent to search. Fine asserted that he informed his lawyer that Knapp would have testified that Fine was under the influence of cocaine at that time. (<u>Id.</u>). In a February 9, 1989 order, the trial court summarily denied Fine's motion. (DE# 18, Ex. F). Fine took an appeal from the trial court's ruling. (DE# 18, Ex. G). The denial of post conviction relief was affirmed without written opinion in <u>Fine v. State</u>, 541 So. 2d 1184 (Fla. 3d DCA March 21, 1989) (Table), the mandate issued on April 6, 1989. (DE# 18, Ex. H, I).

On December 31, 2007, Fine filed a second Rule 3.850 motion in the state trial court wherein he raised twenty issues. (DE# 18, Ex. J). Several issues alleged ineffective assistance of counsel

based on counsel's representation during the trial.[1]  Fine raised multiple issues wherein he alleged that the trial court committed various errors which resulted in a fundamental miscarriage of justice.[2]  Fine also argued that the record reflects that he is actually innocent of the crimes.  Finally, three of the issues were based on newly discovered evidence.  First, as he asserted in his original Rule 3.850 motion, Fine alleged ineffective assistance of counsel in failing to move to suppress the confession and evidence found following Fine's signing a consent to search form.  Fine again asserted that Officer Knapp's testimony regarding his mental state during the intake process would have resulted in the trial court's granting the motion to suppress.  In support of his claim, Fine attached an affidavit executed by Knapp on March 1, 2007. (DE# 18, Ex. P, App. 29).  The affidavit states the following, in pertinent part,

> 2.  On the morning of 6/15/83, I was working as a second floor supervisor on the 12:00am to 8am shift at the Miami-Dade County Jail.
>
> 3.  On the morning of 6/15/83, Mr. Owen fine was transferred into my custody.
>
> 4.  After the booking process was completed, I took Owen Fine through the orientation process and issued Owen Fine such things as his mattress and sheets and also explained the jail rules and procedures.

---

[1]  Fine alleged ineffective assistance of counsel for failing to adequately impeach several state witnesses, failing to object to improper comments by the prosecutor during the opening and closing statement, failing to present a coherent closing statement, failing to file a motion for a psychological evaluation of a critical state witness, failing to investigate and depose a potential defense witness, failing to move for a mistrial based on improper conduct during the direct examination of a state witness.

[2]  Fine argued that the trial court erred by admitting his coerced confession and the items found in his hotel room after Fine executed a coerced consent to search form, by submitting an improper verdict form to the jury, and by failing to order a new trial after a portion of the trial was not transcribed by the court reporter.

> 5.  In my years as a Correctional Officer, I have
> frequently had occasion to observe and come into contact
> with people under the influence of alcohol and/or drugs.
> 6.  At the time I observed Owen Fine, he appeared to be
> under the influence of an intoxicant or drug.  Mr. Fine's
> responses to my attempts to communicate to him were
> nearly incoherent.
>
> 7.  Based upon this experience, I believe Owen Fine was
> in a drug induced state and he appeared confused, unsure
> of his whereabouts, and extremely unsteady.
>
> . . .
>
> I have since retired from the Department of Corrections
> and I am no longer reluctant to testify in this matter.

(Id.).   Fine explained that Knapp came forward on his own and
provided Fine with this affidavit in 2007.   Second, Fine argued
that a newly discovered police report established that the state's
key witness, Jose Garcia, owned a firearm and lied when he
testified at Fine's trial that he had no knowledge of firearms.
(DE# 18, Ex. J).   Third, Fine argued that newly discovered evidence
of a photo line-up tainted Garcia's identification of Fine as the
shooter.   (Id.).

On October 2, 2009, the trial court issued a detailed written
order denying Fine's post conviction motion. (DE# 18, Ex. N).   Fine
appealed the order, and the trial court's ruling was again affirmed
without written opinion in Fine v. State, 36 So. 3d 676 (Table)
(Fla. 3d DCA January 27, 2010).   Fine filed a motion for rehearing,
which was denied and the mandate issued on May 11, 2010. (DE# 18,
Ex. S, T).

On July 26, 2010,[3] Fine filed the instant pro se petition for

---

[3]    This Court also applies the "mailbox rule" and deems the Petition
"filed on the date it was delivered to prison authorities for mailing." Alexander
v. Sec'y Dep't of Corr., 523 F.3d 1291, 1294 n. 4 (11 Cir. 2008). See also Adams

writ of habeas corpus pursuant to 28 U.S.C. §2254. (DE# 1). Subsequently, Fine filed an amended petition wherein he restated verbatim the twenty claims asserted in his December 31, 2007 Rule 3.850 motion. (DE# 11). This court issued an order to show cause wherein it directed the state to respond to the petition and amended petition. (DE# 14). The state filed a response, with supporting exhibits attached, including a complete transcript of the original criminal trial which took place in state court in November of 1984. (Cr DE# 18).

### III.  Statute of Limitations

In the response to the order to show cause, the respondent first asserts that the instant petition is time-barred pursuant to 28 U.S.C. §2244(d).

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner must generally file his §2254 petition within one year from the date that his conviction became final by the conclusion of direct review or the expiration of the time for seeking such review. See 28 U.S.C. §2244(d)(1)(A); Jimenez v. Quarterman, ___ U.S. ___, 129 S.Ct. 681, 685-86, 172 L.Ed.2d 475 (2009)(explaining the rules for calculating the one-year period under §2244(d)(1)(A)).[4] Prisoners who are attacking a conviction or

---

v. U.S., 173 F.3d 1339 (11 Cir. 1999)(prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing).

[4]   The statute provides that the limitations period shall run from the latest of —

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such action;

sentence that became final prior to the enactment of the AEDPA must be accorded a reasonable time after the AEDPA's effective date within which to file petitions for habeas relief pursuant to section 2254.[5] Cf. Wilcox v. Florida Dep't of Corrections, 158 F.3d 1209 (11 Cir. 1998); Goodman v. United States, 151 F.3d 1335 (11 Cir. 1998). In this context one year has been held to be a reasonable time, and therefore petitioners attacking convictions or sentences that became final before the AEDPA's effective date will be accorded the one-year post-AEDPA period, commencing on the Act's effective date, within which to file for section 2254 relief. Id.

This period is tolled while a properly filed application for State post-conviction relief or other collateral review with respect to the pertinent judgment or claim is pending.[6] 28 U.S.C. §2244(d)(2). Moreover, the one-year limitations period is also subject to equitable tolling in "rare and exceptional cases." See Lawrence v. Florida, 549 U.S. 327, 336, 127 S.Ct. 1079, 1085, 166 L.Ed.2d 924 (2007)(although first noting that the Court has not yet

---

        (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
        (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2244(d)(1).

    [5]Although the Act did not contain an effective date provision for the foregoing amendment, it is presumed to have become effective on April 24, 1996, the date the law was enacted. Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991)(citations omitted)(absent a clear direction by the Congress to the contrary, a law takes effect on the date of its enactment). See also Hatch v. Oklahoma, 92 F.3d 1012, 1014 n. 2, citing Bradshaw v. Story, 86 F.3d 164, 166 (10 Cir. 1996).

    [6]A properly-filed application is defined as one whose "delivery and acceptance are in compliance with the applicable laws and rules governing filings," which generally govern such matters as the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee. Artuz v. Bennett, 531 U.S. 4 (2000)(overruling Weekley v. Moore, 204 F.3d 1083 (11 Cir. 2000)).

decided whether §2244(d) allows for equitable tolling, the Court held that for equitable tolling to apply, a petitioner has the burden of proving: "(1) that he ha[d] been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."). See also Helton v. Secretary for Dept. of Corrections, 259 F.3d 1310, 1312 (11 Cir. 2001)(stating that "[e]quitable tolling can be applied to prevent the application of the AEDPA's statutory deadline when 'extraordinary circumstances' have worked to prevent an otherwise diligent petitioner from timely filing his petition."), cert. denied, 535 U.S. 1080 (2002).

The judgment of conviction and sentence in the instant case became final on February 23, 1987, when Fine's 90-day window for filing a petition for a writ of certiorari expired. See Jimenez v. Quarterman, ____ U.S. ____; 129 S.Ct. 681, 685 (2009); SUP.CT.R. 13(1). This federal petition for writ of habeas corpus challenging the instant convictions and sentences was not filed until July 26 2010, far-beyond one-year after the date on which the convictions and sentences became final. Accordingly, the petition is time-barred pursuant to 28 U.S.C. §2244(d)(1)(A) unless the appropriate limitations period was extended by properly filed applications for state post-conviction or other collateral review proceedings. 28 U.S.C. §2244(d)(2).

As indicated above, Fine pursued postconviction challenges to his convictions and sentences in both the state trial and appellate courts. Fine is however not entitled to statutory tolling time credit pursuant to 28 U.S.C. §2244(d)(2) while any of the postconviction proceedings remained pending, because they were instituted either before the applicable one-year limitation period commenced or after the expiration of the applicable limitations

period. See Tinker v. Moore, 255 F.3d 1331, 1332 (11 Cir. 2001)(holding that a state petition filed after expiration of the federal limitations period cannot toll the period, because there is no period remaining to be tolled); Webster v. Moore, 199 F.3d 1256, 1258-60 (11 Cir.)(holding that even properly filed state court petitions must be pending in order to toll the limitations period), cert. denied, 531 U.S. 991 (2000). The instant petition was, therefore, due in this Court on or before April 24, 1997.

Unless Petitioner establishes that he is entitled to proceed under one of §2244(d)(1)'s statutory tolling provisions, see §2244(d)(1)(B)-(D), or is entitled to equitable tolling of the limitations period, the petition is time-barred. An order was entered requiring the petitioner to state whether one or more of the statutory factors justify consideration of this petition for writ of habeas corpus. (DE# 5). The petitioner was notified that failure to demonstrate the existence of at least one of the four factors would probably result in dismissal of the petition. Id. Fine has extensively addressed the limitations issue in his petition and has also filed a response to this Court's order and a reply to the respondent's response. (DE# 1, 11, 15, 22). In his pleadings, Fine appears to acknowledge that the instant petition is untimely. He argues, however, that his late filing should be excused in that he is entitled to statutory tolling pursuant to 28 U.S.C. 2244(d)(1)(D) on the basis that he could not discover the factual predicate of his claim until after the one-year limitation period had already expired and/or equitable tolling on the basis of newly discovered evidence of actual innocence. (DE# 15).

In rare instances, the limitation period may run from a date later than the date on which the judgment became final, see 28 U.S.C. §2244(d)(1)(B)-(D). These include the date on which the

12

factual predicate of the claim or claims presented could have been
discovered through the exercise of due diligence. 28 U.S.C.
§2244(d)(1)(D). To warrant application of section 2244(d)(1)(D),
Petitioner must persuade this Court that he exercised due diligence
in his search for the factual predicate of his claim(s). The
Eleventh Circuit has held that an application that "merely alleges
that the applicant did not actually know the facts underlying ...
his claim" is insufficient to show due diligence. In re Boshears,
110 F.3d 1538, 1540 (11 Cir. 1997). The inquiry is "whether a
reasonable investigation ... would have uncovered the facts the
applicant alleges are 'newly discovered.'" Id. (citation omitted).

     The factual predicate on which Fine bases a majority of his
claims could have been discovered by due diligence during the 1984
trial. Fine alleges that the trial court committed several errors
during his criminal trial which resulted in a violation of his due
process rights. (See supra, note 2). Fine became aware of these
alleged errors either at the trial itself, or when reviewing the
trial transcripts. Accordingly, these issues are time-barred. To
the extent Fine asserts that his defense counsel failed to object
to prosecutorial comments, failed to adequately impeach state
witnesses, and failed to present an effective closing statement,
these issues are also time barred. Fine was, or could have been,
aware of defense counsel's actions during the trial. Fine appears
to concede that these issues cannot be considered at this late
date, but asserts that the issues show that in light of the
"totality of the circumstances," the petitioner is "actually
innocent, suffered from ineffective assistance of counsel,
capitulated under coercive police illegal subterfuge," and was
subjected to a trial "saturated with due process violations causing
manifest injustice and . . . a fundamental miscarriage of justice."
(DE# 22, p. 2). This argument does not overcome Fine's failure to

13

raise these issues in a timely fashion.

In support of the three remaining issues, Fine relies on three pieces of newly discovered evidence: (1) Officer Knapp's March 1, 2007 affidavit (reproduced above); (2) a 1/27/83 police incident report, dated four months before the June 11, 1983 crimes, which shows that the state's witness, Jose Garcia, reported the loss of a .357 caliber revolver; and (3) a photograph of Fine which police allegedly showed to Garcia in the hospital several days after the shooting. Fine explains in his reply to the state's response that upon receiving Knapp's affidavit, Fine's wife conducted an extensive search of the police archives and discovered the second and third pieces of evidence. (DE# 22).

Based on this evidence, Fine asserts three arguments. First, Fine asserts that his conviction should be vacated and he should be given a new trial because the jury found him guilty based primarily on his confession and the evidence seized from his hotel room. This evidence was obtained in violation of his constitutional rights because his intoxicated state, testified to in Officer Knapp's 2007 affidavit, shows that he was incapable of knowingly waiving his rights and voluntarily giving a confession and consent to search. Second, Fine argues that the police report regarding Garcia's missing firearm constituted impeachment evidence as Garcia testified at trial that he had no knowledge of guns. Fine alleges that the state was aware of the incident report and permitted Garcia to lie on the stand, thereby committing a violation of Giglio v. United States, 405 U.S. 150, 153 (1972) and Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). Third, Fine argues that the additional photographs of himself, found in Diaz's police file, establish that Diaz showed Garcia additional photographs of Fine in order to obtain Garcia's

14

positive identification of Fine as the shooter.  Previously, Fine believed that Garcia was shown a photo line-up with six photographs, only one of which was Garcia.

With respect to **Officer Knapp's affidavit**, Fine's position that he would not have been able to obtain Knapp's testimony through the exercise of due diligence has merit.  Fine clearly knew that Knapp could have undermined the validity of his confession in 1988 when he filed his original (timely) Rule 3.850 postconviction motion and argued ineffective assistance of counsel for failing to move to suppress the confession and consent form based on Knapp's observations.  It appears that Knapp would not have been willing to testify at that time.  In 2007, he came forward, without prompting from Fine, and executed the affidavit wherein he stated that an hour after Fine gave his formal statement he was "nearly incoherent . . . appeared confused, unsure of his whereabouts, and extremely unsteady." (DE# 18, Ex. P, App. 29).  Importantly, Knapp asserted in the affidavit, "I have since retired from the Department of Corrections and am *no longer reluctant* to testify in this matter." (Id.) (emphasis added).  Notwithstanding Fine's efforts, Knapp appears not to have been willing to testify until 2007.  Fine notes that Florida courts consider newly available testimony to constitute newly discovered evidence.  See Brantley v. State, 912 So.2d 342 (3d DCA 2005); Burns v. State, 858 So. 2d 1229 (1st DCA 2003).

Fine asserts that the **1/27/83 police incident report** was part of Detective Diaz's file in Fine's criminal case and that in 1988 Diaz denied a request made by Fine to review the file.  When Fine asserted this argument in his 2007 Rule 3.850 motion, he provided the state court with a copy of the police incident report and a copy of a document purporting to be a denial of his request to

15

review Diaz's file.  (DE# 18, Ex. P, App. 9, 11).  Fine fails to explain why he abandoned his efforts to uncover this evidence for twenty years.  In addition, Fine does not present any evidence that the report was part of Diaz's file in 1988 or that the report is authentic.  Unlike Knapp's testimony, the police incident report constitutes evidence which could have been obtained through the exercise of due diligence.[7]  Fine explains that he found the report when his wife searched police archives on 2007, but fails to explain why this search could not have been performed earlier.

Lastly, Fine alleges that Diaz's file included a **photograph** of Fine which Diaz showed to Garcia in the hospital shortly after the shooting to obtain Garcia's positive identification of Fine. According to an excerpt of Garcia's pre-trial deposition, which Fine provided in his amended §2254 petition, Garcia stated that he was shown *several* photographs of Fine.  (DE# 11, p. 26). Accordingly, Fine knew or should have known that a photograph of Fine, other than that included in the six-man photo line-up, was in the possession of the investigating officers and presented to Garcia at the hospital.  Based on this knowledge, Fine could have discovered the photograph through the exercise of due diligence. The fact that Fine's wife ultimately discovered the photograph by initiating a search of the police archives shows that the photograph could have been discovered earlier.

Accordingly, it is apparent from the above-reviewed record

---

[7] Fine argues that the police report constituted impeaching evidence, however, impeaching evidence alone cannot supply the basis for a new trial nor does it necessarily prove perjury, which requires a showing that the witness intentionally lied on the stand. United States v. Schlei, 122 F.3d 944, 991 (11 Cir. 1997). See also Taylor v. State, 3 So.2d 986, 993-94 (Fla. 2 DCA 2009)(stating that when determining whether newly discovered evidence compels a new trial, trial court should consider whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence).

that, with respect to the second and third issue mentioned above, Fine is confusing his knowledge of the factual predicate of his claims with the time permitted for gathering evidence in support of his claim, and therefore his contention that the statute of limitations did not begin to run until after he had personally obtained knowledge about his legal claim is meritless, as properly determined by the state courts. See Flanagan v. Johnson, 154 F.3d 196, 198-99 (5 Cir. 1998). See also Worthen v. Kaiser, 952 F.2d 1266, 1268-68 (10 Cir. 1992)(holding that petitioner's failure to discover the legal significance of the operative facts does not constitute cause). Further, under §2244(d)(1)(D), the time begins to run when petitioner knows, or through due diligence, could have discovered, the important facts for his or her claims, not when petitioner recognizes the facts' legal significance. Owens v. Boyd, 235 F.3d 356, 359 (7 Cir. 2000). In other words, "Section 2244(d)(1)(D) does not convey a statutory right to an extended delay ... while a habeas petitioner gathers every possible scrap of evidence that might, by negative implication, support his claim." Flanagan v. Johnson, 154 F.3d 196, 199 (5 Cir. 1998). The alleged newly discovered evidence, i.e., the police incident report and the photograph, is clearly not new and thus any contention that the statute of limitations did not begin to run until sometime in 2007 is without merit.

It therefore cannot reasonably be concluded that the purported facts were not known or could not have been discovered by Fine with due diligence. The trial court's factual findings are presumed correct by this Court since they have not been rebutted by clear and convincing evidence. See 28 U.S.C. §2254(e)(1). Fine did not exercise due diligence in discovering these facts as required under §2244(d)(1)(D). See United States ex rel. Caffey v. Briley, 266 F.Supp.2d at 792-93 (holding that state prisoner serving sentence

17

for murder did not exercise due diligence in discovering facts supporting his actual innocence habeas claim as required to toll running of habeas limitations period until date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence, where he did not present affidavit of one of the shooting victims, averring that prisoner did not shoot any of the victims, until approximately eight years after the crimes were committed, even though the affiant was named in the indictment and interviewed in the hospital). This Court, therefore, concludes that with respect to all issues, except the issue based on Officer Knapp's affidavit, the one-year limitation period was not tolled by the statutory exception embodied in 2244(d)(1)(D). See Johnson v. United States, 544 U.S. 295 (2005).

Fine next apparently asserts that he is entitled to equitable tolling of the limitations period on the basis of actual innocence. It is first noted that it is still unclear whether the Eleventh Circuit will recognize an "actual innocence" exception to the AEDPA's one year statute of limitations.[8] See e.g., Milton v. Secretary, Department of Corrections, 347 Fed.Appx. 528, 2009 WL 3150246 (11 Cir. 2009), citing, Wyzykowski v. Department of Corr., 226 F.3d 1213, 1218-19 (11 Cir. 2000)("To avoid answering that difficult constitutional question until necessary, we have held that before addressing whether the AEDPA's limitations period constitutes a violation of the Suspension Clause in the case of a

---

[8]    Several other circuit courts have recognized such an exception. See e.g., Souter v. Jones, 395 F.3d 577, 602 (6 Cir. 2005)("[W]e hold that where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims."); Flanders v. Graves, 299 F.3d 974, 977 (8 Cir. 2002)("[A]ctual innocence, if it can be shown, opens the gate to consideration of constitutional claims on their merits, claims that would otherwise be procedurally barred.").

claim of actual innocence, we should first consider whether the petitioner can show actual innocence."); Taylor v. Secretary, Dep't of Corrections, 230 Fed. Appx. 944, 945 (11 Cir. 2007)("[W]e have never held that there is an 'actual innocence' exception to the AEDPA's one-year statute of limitations, and we decline to do so in the instant case because [the petitioner] has failed to make a substantial showing of actual innocence.").

        "To establish actual innocence, [a habeas petitioner] must demonstrate that ... 'it is more likely than not that no reasonable [trier of fact] would have convicted him.' Schlup v. Delo, 513 U.S. 298, 327-328, 115 S.Ct. 851, 867-868, 130 L.Ed.2d 808 (1995)." Bousley v. United States, 523 U.S. 614, 623 (1998). "[T]he Schlup standard is demanding and permits review only in the "'extraordinary' case." House v. Bell, 547 U.S. 518, 538 (2006). Thus, "[i]n the usual case the presumed guilt of a prisoner convicted in state court counsels against federal review of [untimely] claims." Id. at 537. In this context, "actual innocence" means factual innocence, not mere legal insufficiency. See Sawyer v. Whitley, 505 U.S. 333, 339 (1992). See also Bousley, 523 U.S. at 623-624; Doe v. Menefee, 391 F.3d 147, 162 (2 Cir. 2004)("As Schlup makes clear, the issue before [a federal district] court is not legal innocence but factual innocence."). Schlup observes that "a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.... To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." 513 U.S. at 324.

Here, Fine fails to state a colorable claim of actual innocence. The state presented ample evidence, which Fine does not challenge, to support the jury's verdict. Fine's own testimony included the following facts: he and Weller concocted a plan to purchase cocaine and in the process rip off the dealers; he cashed a check he received from the IRS in order to carry out the plan; he purchased two .45 caliber firearms to arm Weller and himself during the transaction; pursuant to an arrangement made with Sauceda on the morning of July 11, 1983, he and Weller met Sauceda, Damas, Garcia, and Barcelo at Frank Bones's house the same day; he arrived at Bones's house with a briefcase containing cash and armed with the .45; he went inside and handed Damas the money, at which point Damas turned over the cocaine; Weller pulled out his firearm, shot Sauceda (after informing the victim there was a hit out on him), and continued to fire at the others; he followed Weller's lead by pulling out his weapon and firing; and he fired a shot which hit Garcia. In addition, the state presented Bones's testimony that he agreed to allow Weller and Fine to meet with Sauceda at his house on July 11, 1983. The state also presented Garcia's eyewitness testimony that Fine was present, involved in the drug deal, and fired his weapon multiple times, including a shot which hit Garcia. In addition, the state's firearms expert testified that the bodies of both deceased victims had been shot by two different .45 caliber firearms.

In any event, for equitable tolling to apply, a petitioner has the burden of proving: "(1) that he ha[d] been pursuing his rights diligently, *and* (2) that some extraordinary circumstance stood in his way and prevented timely filing." (emphasis added) <u>Lawrence v. Florida</u>, 549 U.S. 327, 336, 127 S.Ct. 1079, 1085, 166 L.Ed.2d 924 (2007)(quotation marks and citation omitted). The Eleventh Circuit has continued to emphasize that "[e]quitable tolling is an

extraordinary remedy that must be applied sparingly" for "[a] truly extreme case." Holland v. Florida, 539 F.3d 1334, 1338 (11 Cir. 2008). Review of the record in this case indicates that Fine has not pursued the process with diligence and alacrity and has, therefore, not sustained his burden of proving that the factual predicates of this case warrant equitable tolling. One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence. See Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151 (1984). See also Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96 (1990)(principles of equitable tolling do not extend to what is best a garden variety claim of excusable neglect). "[E]quity is not intended for those who sleep on their rights." See Fisher v. Johnson, 174 F.3d 710 (5 Cir. 1999), citing, Convey v. Arkansas River Co., 865 F.2d 660, 662 (5 Cir. 1989).

The record also does not indicate that Fine was in any way impeded by any unconstitutional State action in pursuing state postconviction relief or filing this federal petition for writ of habeas corpus. Although his request to review Diaz's file in 1988 was denied, he does not provide evidence that the state continually impeded his efforts to review the file until 2007. Fine also fails to explain why he waited until 2007 to arrange for his wife to conduct an extensive search of the police archives and presents no evidence that such a search could not have taken place earlier.

Accordingly, the time-bar is ultimately the result of Fine's failure to timely institute state postconviction proceedings then this federal habeas corpus proceeding. With the exception of the claim based on Officer Knapp's affidavit, Fine's claims challenging the lawfulness of his convictions are now time-barred pursuant to 28 U.S.C. §2244(d)(1)-(2) and should not be considered on the merits.

IV.  <u>Discussion of Claims</u>

Turning to the merits of the only claim not time barred, Fine is not entitled to relief in this habeas corpus proceeding.  Fine argues that is that the confession and drugs seized in his hotel room were obtained in violation of his constitutional rights as he was intoxicated when waiving his <u>Miranda</u> rights and executing the consent to search form.

The "existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." <u>Townsend v. Sain</u>, 372 U.S. 293 (1963). Further, the Supreme Court has held that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993). It is not the role of the federal courts to make an independent determination of a petitioner's guilt or innocence based on evidence that has emerged since the trial. <u>See</u> <u>Brownlee v. Haley</u>, 306 F.3d 1043, 1065 (11 Cir. 2002). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution--not to correct errors of fact." <u>Id.</u>, <u>quoting</u>, <u>Herrera</u>, 506 U.S. at 400.

The record before this Court refutes Fine's pivotal assertion, namely, that he was intoxicated when he confessed and signed the consent form.  Fine's formal statement was given to officers at 11:30 pm on June 14, 1983 and was transcribed. (DE# 18-11, p. 7). Fine appears coherent throughout the interview.  (<u>Id.</u>).  He understands the questions posed and gives lucid, complete responses. (<u>Id.</u>).  In addition, during Fine's direct examination at

trial, the following exchange took place:

> DEFENSE COUNSEL: What happened when you got [to the police station]?
> FINE: They basically asked me what happened and I told them.
> DEFENSE COUNSEL:    Prior  to  them  asking you what happened, did Detective Diaz-is that the one you talked to?
> FINE: Yes, sir.
> DEFENSE COUNSEL: Did Detective Diaz show you what is called a rights waiver form?
> FINE: Yes, sir.
> DEFENSE COUNSEL: You heard him testifying yesterday that he read you your rights.
> FINE: Yes, sir.
> DEFENSE COUNSEL: In fact, he told you that if you did not want to speak to him, you did not have to; is that correct?
> FINE: Yes.
> DEFENSE COUNSEL:    He said if you wanted to, you could have an attorney present at that time?
> FINE: Yes, sir.
> DEFENSE COUNSEL:    Did you ever try or even ask him to call an attorney at that point in time?
> FINE: No, sir.
> Were you willing to give a free and voluntary statement right there?
> FINE: Yes, sir.
> DEFENSE COUNSEL: You heard the statement that Detective Diaz read to the jury yesterday; is that correct?
> FINE: Yes, sir.
> DEFENSE COUNSEL: Was that statement a truthful statement?
> FINE: Yes, sir.

(DE#18, Ex. U, T 452-54).


    Moreover, there was certainly other strong evidence of guilt. In other words, based upon the other evidence admitted at trial, the introduction of the confession could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. The evidence admitted at trial clearly

supports Fine's convictions.[9] For the reasons stated, Fine cannot meet the high standard of "actual innocence." See Bousley v. United States, 523 U.S. 614 (1998).

### V. Conclusion

Based upon the foregoing, it is recommended that this petition for writ of habeas corpus be denied.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

DONE AND ORDERED at Miami, Florida, this 16th day of February, 2011.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Owen R. Fine
     DC# 096957
     Cross City Correctional Institution
     568 N.E. 255th Street
     Cross City, FL 32628

---

[9] As is stated under the statute of limitations discussion in this report, Fine testified to the following at trial: he and Weller concocted a plan to purchase cocaine and in the process rip off the dealers; he cashed a check he received from the IRS in order to carry out the plan; he purchased two .45 caliber firearms to arm Weller and himself during the transaction; pursuant to an arrangement made with Sauceda on the morning of July 11, 1983, he and Weller met Sauceda, Damas, Garcia, and Barcelo at Frank Bones's house the same day; he arrived at Bones's house with a briefcase containing cash and armed with the .45; he went inside and handed Damas the money, at which point Damas turned over the cocaine; Weller pulled out his firearm, shot Sauceda (after informing the victim there was a hit out on him), and continued to fire at the others; he followed Weller's lead by pulling out his weapon and firing; and he fired a shot which hit Garcia.  In addition, the state presented Bones's testimony that he agreed to allow Weller and Fine to meet with Sauceda at his house on July 11, 1983.  The state also presented Garcia's eyewitness testimony that Fine was present, involved in the drug deal, and fired his weapon multiple times, including a shot which hit Garcia.  In addition, the state's firearms expert testified that the bodies of both deceased victims had been shot by two different .45 caliber firearms.

Richard L. Polin
Rolando Antonio Soler
Attorney General Office
Department of Legal Affairs
444 Brickell Avenue
Suite 650
Miami, FL 33131